**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-540-PLF** |
| **TIMOTHY ALLEN HART,** | |
| **Defendant.** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Timothy Allen Hart to 4 months of imprisonment, three years of supervised release, $2,000 in restitution, and a $100 special assessment. The government's recommended sentence is at the midpoint of the 0 to 6-month guideline range calculated by the United States Probation Office and estimated by the parties in the guilty plea agreement.

## I.     INTRODUCTION

The defendant, Timothy Allen Hart, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States

Hart, the owner of a paintball business and part-time co-host of a talk show that covered daily political news, placed himself at the front of the mob that initially breached barricades surrounding the U.S. Capitol building.   He joined other rioters to overrun the well-marked barriers manned by uniformed officers at the Peace Circle, in the first breach of the restricted Capitol grounds.   He then waded through the mob, ignoring the pepper spray and violence in front of him, and moved towards and, eventually, inside the U.S. Capitol building.   He remained inside the building for approximately 22 minutes, where he wandered through the corridors and smoked marijuana in the Rotunda.

For his actions, the government recommends that the Court sentence Hart to 4 months' incarceration for his conviction of violating 18 U.S.C. § 231(a)(3) (civil disorder). The government's recommended sentence reflects the gravity of Hart's conduct at the Peace Circle and inside the Capitol building and holds him responsible for the consequences of his actions on January 6, 2021.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 60, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

---

Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

**B.     Hart's Role in the January 6, 2021 Attack on the Capitol**

*Travel to the Capitol*

On January 4, 2021, Hart traveled to Washington D.C. by car.  He posted pictures of himself on social media while on the road.   In one video, Hart filmed himself declaring, "It's 11:50 on Monday, the 4th of January, 2021, and I am headed to Washington D.C. to represent Donald J. Trump. See ya there."   When he posted that video to social media, he captioned it, "Headed to DC from Dayton Ohio to support President Trump because the election was tainted."



*Image 1 (Hart driving to Washington D.C.)*

3

***Breach at the Police Line and Barricades at Peace Circle***

On January 6, 2021, as preparations for the certification of the Electoral College vote count were underway in the House and Senate, Hart joined a large crowd that was gathered on the west side of the U.S. Capitol near the Peace Monument, commonly referred to as "Peace Circle." The Peace Circle was the location of the first breach of the restricted area of Capitol grounds, and Hart arrived around 12:45 p.m., just minutes before that breach.

At the Peace Circle, fencing had been erected to keep crowds off the Capitol grounds. Large white signs, with "AREA CLOSED" printed in bold red lettering, were affixed to the fencing. As the crowd moved southeast to the threshold of the sidewalk that connects Peace Circle to the U.S. Capitol building, commonly referred to as the "Pennsylvania Ave Walkway," the crowd confronted additional metal barricades made from bicycle racks, which also bore the same "AREA CLOSED" signs. The barricades were physically linked end to end, and were reinforced with dark-colored plastic mesh safety fencing. These barricades had been put in place by U.S. Capitol Police in order to keep the public away from the Capitol building and the Congressional proceedings underway inside.

Hart, wearing a red hood with a black hat and sweatshirt with a "Q" on it, positioned himself with the other rioters against the fencing, as shown in open-source video[2] (Images 2 and 3, below with Hart circled in red in images):

---

[2] Images 2, 3, 4, 5 and 6 are screenshots from a video posted by Buggs Media Network on January 11, 2021, available at   https://www.youtube.com/watch?v=mruJcnSSn54&t=200s with the most relevant timestamp of 1:50 to 4:00 minutes.



*Image 2 (Hart at the barricade)*



*Image 3 (Hart at the barricade)*

Amidst screams of profanity towards officers and politicians, rioters on the end of that barricade opposite Hart violently engaged with U.S. Capitol Police officers and began rocking and shoving the barricades. Hart joined the other rioters and pushed one such barricade with his hands and his foot, helping to overrun the security checkpoint, as shown in Images 4 and 5 below.

5



*Image 4 (Hart helping to move the barricade)*



*Image 5 (Hart helping to move the barricade)*

The rioters, including Hart, breached the barricades, hopping over the downed fence and forcing officers to retreat. Hart then joined a multitude of other rioters in rushing onto the restricted area of Capitol grounds. The mob now had direct access to the Capitol building, as shown in Image 6 below.



*Image 6 (Hart advancing past the barricade)*

**Breach of the U.S Capitol Building**

Despite encountering additional lines of police officers and pepper spray, Hart continued with the mob to overrun law enforcement and move closer to the Capitol building. While doing so, he took videos of the riot, using his mobile device and a selfie-stick, as captured in open-source video, as seen in Images 7 and 8 below.[3]   In that video, he also appeared to be wearing a bright orange speaker around his neck.

---

[3] Images 7, 8, 9 10 and 11 are from a publicly available video posted on Twitter, available at https://d2hxwnssq7ss7g.cloudfront.net/aRWTR7sk7i90_cvt.mp4 with the most relevant timestamps at 4:40-4:46. 8:35-8:50, 1:26 -11:42/



*Images 7 and 8 (Hart advancing up the Capitol steps and capturing images on his cell phone)*

Having breached the police lines, Hart then encouraged other rioters to move towards the

Capitol. At one point , a person standing in front of Hart yelled, "We already voted and what have

they done? They stole it! We want our fu**ing country back. Let's take it!"   The man standing in

front of Hart then yelled, "Come on!" and "Let's go!" multiple times.   While the man was yelling,

Hart gestured towards the crowd, waving them onward, and encouraging them to continue moving

closer to Capitol, as captured on open-source video (Images 9, 10, and 11 below).



*Images 9, 10, and 11 (Hart waiving to the crowd)*

Approximately two hours after participating in the breach at the Peace Circle, Hart had made his way around to the Capitol's east side, where he entered the building through the Upper East Door at approximately 2:45 p.m., as capture by CCTV and as shown in Image 12 below.



*Image 12 (Hart entering Capitol building)*

9

He then proceeded to walk down the south corridors, recording events along the way.



*Image 13 (Hart capturing images while walking through Capitol building)*

He continued to wander through the halls of the Capitol until he reached the Rotunda:



*Image 14*



*Image 15*



*Image 16*

While in the Rotunda, Hart stopped and smoked marijuana; the event was captured in an Instagram video posted on an account called "brotunda" on or about January 6, 2021 and was captioned, "There were many Brotunda's under the Rotunda that day…"



*Image 17 (Hart in the rotunda with marijuana)*

After approximately 13 minutes in the Rotunda, Hart headed towards the East Door, where he left the Capitol building at 3:06 p.m., having spent approximately 21 minutes total inside the building.

### *Interview of Defendant*

Hart was interviewed by law enforcement.   During the interview he attempted to minimize his involvement, suggesting he did not push the barricade and that he was not, in fact, encouraging other rioters to get closer to the Capitol by waving them forward.   Instead, he stated he was waving in an attempt to tell rioters to get down from scaffolding.

### III.    THE CHARGES AND PLEA AGREEMENT

On January 6, 2022, a federal grand jury returned a Superseding Indictment charging Hart with Civil Disorder, in violation of 18 U.S.C. § 231(a)(3), Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and (2); Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104 (e)(2)(G).   On April 26, 2023, Hart was convicted of Civil Disorder in violation of 18 U.S.C. § 231(a)(3) based on a guilty plea entered pursuant to a plea agreement.

### IV.    STATUTORY PENALTIES

Hart now faces sentencing for his violation of 18 U.S.C. § 231(a)(3).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, he faces up to 5 years of imprisonment, a term of supervised release of not more than three years[4], a fine up to $250,000, and a mandatory special assessment of $100.

---

[4] The plea agreement incorrectly states that the maximum term of supervised release is not more than one year. However, the PSR correctly states that the maximum term is three years. PSR ¶ 111. Although the plea agreement made no specific representation as to what the Government's recommended term of release would be, it did contain an error with respect to the stated applicable maximum term of release. Therefore, with the Court's concurrence, the parties filed a notice of correction (ECF No. 67) so that the Defendant would be re-apprised of the proper applicable range prior to sentencing

## V.      THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).   Pursuant to the plea agreement and consistent with the Presentence Report, the parties agree on the following sentencing guidelines range:

Count One: 18 U.S.C. § 231(a)(3)

| | |
|---|---|
| U.S.S.G. § 2A2.4 Base Offense Level | 10 |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | <u>-2</u> |
| **Total Adjusted Offense Level:** | **8** |

*See* Plea Agreement at ¶ 5(A).

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 51. Accordingly, with a total adjusted offense level, after acceptance of responsibility, of 8, Hart's Guidelines imprisonment range is 0 to 6 months.   Hart's plea agreement includes an agreed-upon Guidelines range calculation that mirrors the calculation set forth above.

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.      Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds

of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Hart's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a defendant like Hart, the absence of violent or assaultive acts is not a mitigating factor.   Had Hart engaged in such conduct, he would have faced additional criminal charges.

As shown in Section II(B) of this memorandum, Hart's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Hart placed himself at the front of a mob that initially breached the Peace Circle, where he ignored the fencing and barricades signaling to protestors that entry onto restricted Capitol grounds was prohibited.   Then, he helped kick down the barricades protecting the U.S. Capitol.   He was at the front line of a mob that violently overtook police lines and opened a pathway for rioters to reach the Capitol building. Despite observing tear gas and violence around him, Hart encouraged rioters to advance and, ultimately, breached the Capitol building himself, taking time to smoke marijuana with others in the Rotunda.   For these reasons, the nature and circumstances of Hart's offense was very serious, and fully supports the government's recommended sentence of 4 months.

### B.  The History and Characteristics of the Defendant

Hart owns and operates a business in Ohio.   He also co-hosts a talk show that covers "daily POTUS tweets, Q posts new and old, and news around the world."   Although he falls in Criminal History Category I, his history includes numerous law enforcement contacts, including convictions for aggravated robbery in 1991, disorderly conduct in 1995 and failure to file sales tax in 2007, none of which result in any criminal history points. Hart also has a telecommunications harassment conviction in 2013 that scored one point.[5]   His history of recidivism is particularly concerning in light of his conduct at the Capitol on January 6: a common theme in Hart's criminal history is violence and contempt for the rule of law. Hart's attempt to minimize his conduct on January 6, coupled with his history of recidivism, demonstrate the likelihood that Hart could engage in similar conduct in the future.   Thus, Hart's history and characteristics weigh in favor of the recommended term of incarceration.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that

---

[5]   According to the Complaint in the harassment case, Hart knowingly caused or permitted telecommunication harassment to the victim by stating, "They can kiss my ass and chase me down and then they'll get a bullet in their fucking head." PSR ¶ 49.

these offenses were an attack on our democracy and that jail time is usually -- should be expected")

(statement of Judge Hogan).   Hart's criminal conduct on January 6 was the epitome of disrespect

for the law.

    **D.**    **The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime

generally, and specific deterrence, or the need to protect the public from further crimes by this

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir.

2010).

### *General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every

case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most

compelling reason to impose a sentence of incarceration. "Future would-be rioters must be

deterred." (Statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-

CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that

their attack on the Capitol would disrupt, if not prevent, one of the most important democratic

processes we have: the peaceful transfer of power to a newly elected President.   The gravity of

these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW),

Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because

unfortunately there are a lot of people out here who have the same mindset that existed on January

6th that caused those events to occur. And if people start to get the impression that you can do

what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

Thus, the need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[6] For these reasons, the demands of general deterrence weigh strongly in favor of incarceration here.

---

[6] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

***Specific Deterrence***

As noted above, the need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of incarceration. Hart used force to help push over barricades and rush the U.S. Capitol Police line.  Undeterred by the tear gas and violence around him, he encouraged other rioters to get closer and, himself, entered the U.S. Capitol Building. Once inside, he wandered around and showed total disdain for the rule of law by casually smoking marijuana inside the Rotunda. Indeed, as he was being filmed smoking, the videographer is heard counting how many "joints" were in the video and asking another individual if he smoked weed.

Hart's disregard for barricades, law enforcement, and for the U.S. Capitol building—the citadel of our democracy—demands accountability.   His sentence must ensure he appreciates the criminality of his actions and does not attempt any such actions again. This is especially true given his attempts to minimize his conduct on that day.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by

professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.   Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, to assault on police officers, to conspiracy to corruptly interfere with Congress.[7]

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being

---

[7] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[8]

---

[8] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[9]

Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Daniel Johnson*, 21-CR-407-DLF, the defendant was sentenced to four months' incarceration for violation of 18 U.S.C. § 231. Daniel Johnson and his father climbed through a smashed-out window near the Senate Wing Door to unlawfully enter the U.S. Capitol building, where Daniel Johnson remained for approximately 26 minutes. Once inside, the Johnsons joined a group of rioters in rushing and shoving aside several U.S. Capitol Police officers who were guarding the East Rotunda doors from a mass of additional rioters gathered outside. The Johnsons, along with a group of other rioters, pushed against the line of police officers, sandwiching them against the doors, and forced open the East Rotunda doors. When the doors were opened, they were at the front of the group.  While Hart did not push against law

---

[9] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

enforcement like Daniel Johnson, his actions helped bring down a barricade that allowed the mob behind him (and mob later to come) to reach the Capitol building.   His later encouragement of the mob to advance towards the Capitol also supports the imposition of this sentence.

In *United States v. Robert Fairchild*, 21CR-551-TFH, the defendant was sentenced to 6 months of incarceration.   In that case, Fairchild spent two hours in the restricted area of the West Plaza of the Capitol Grounds, most of which at the front of the crowd. For more than an hour, Fairchild looked for opportunities to weaken the perimeter established by the police to protect the Capitol Building.   Acting on those opportunities, he took part in dragging multiple barriers back from the front line and into the crowd, which helped the growing mob eventually reach the Capitol Building. He also pushed against multiple police officers, individually and as part of a crowd, adding to the constant barrage that eventually caused police to retreat and allowed the building to be breached. Fairchild then entered the Capitol building, and gleefully chanted "Fight for Trump" while inside.   Similarly, Hart helped to breach a critical point in protecting the Capitol by helping to take down the barricades at the critical Peace Circle, which served as a tip of the spear for the mob to descend on the Capitol building.   Hart's actions there and subsequent actions encouraging rioters to move forward, and behavior and time spent inside the Capitol building warrant a similar sentence.

This Court may also consider the sentence imposed on Nolan Cooke, 22-cr-52 (RCL). Cooke, like Hart, pleaded guilty to a single count of violating 18 U.S.C. § 231(a)(3).   While Cooke did not enter the Capitol building—which mitigates the nature and circumstances of his offense— he directly engaged with police officers both at the bike rack barriers and near the Rotunda Doors,

subjecting him to an additional three points for "physical contact" under the Sentencing Guidelines. *See* U.S.S.G. § 2A2.4(b)(1)(A). Thus, Cooke faced a higher Guidelines range—8-14 months as opposed to Hart's 0-6 months. Cooke ultimately received a sentence of 366 days' incarceration.   A sentence of 4 months' incarceration for Hart would not result in an unwarranted sentencing disparity for Capitol riot defendants sentenced for violations of 18 U.S.C. § 231(a)(3).

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[10] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted

---

[10]  The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

under 18 U.S.C. § 3663(a)(3), that Hart must pay $2,000 in restitution, which reflects in part the role Hart played in the riot on January 6.[11] Plea Agreement at ¶ 12.   As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 2022. *Id.*   Hart's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 12.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 4 months of imprisonment, three years of supervised release, $2000 in restitution, and a $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:   */s/ Samantha R. Miller*
    SAMANTHA R. MILLER
    Assistant United States Attorney
    New York Bar No. 5342175
    United States Attorney's Office
    For the District of Columbia
    601 D Street, NW 20530
    Samantha.Miller@usdoj.gov

---

[11] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

*/s/ Joseph Huynh*
JOSEPH H. HUYNH
D.C. Bar No. 495403
Assistant United States Attorney (Detailed)
405 East 8th Avenue, Suite 2400
Eugene, Oregon 97401-270