# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Criminal Case No.** |
| | : | |
| **TIMOTHY ALLEN HART,** | : | **1:21-cr-00540 (PLF)** |
| | : | |
| **Defendant** | : | |
| | : | |
| _____ | : | |

## DEFENDANT TIMOTHY ALLEN HART's
## SENTENCING MEMORANDUM

Plaintiff **TIMOTHY ALLEN HART** ("Hart") by undersigned counsel, hereby submits to the

Court his Sentencing Memorandum as follows:

### I.    INTRODUCTION AND OVERVIEW

Timothy Allen Hart, by counsel, accepts and generally agrees with the Presentencing

Investigation Report (PSR) prepared by the U.S. Probation Office dated June 21, 2023, filed at ECF

Dkt. # 62.  Counsel responds that the PSR's analyses and recommendations are consistent with the

plea negotiations and expectations of the Defendant.

However, Defendant's counsel notes that the U.S. Attorney's Office ("USAO") frequently

tends to ignore the PSR of Defendants and press a highly-exaggerated and negative scenario which

asks the Court to effectively disregard the PSR's recommendations.  Hart would disagree with any

enlargement of the proposed sentencing from what the PSR recommends and what the negotiations

and discussions leading to the plea agreement by the USAO focused on.  Defendant Hart files this

Defendant's Sentencing Memorandum with the purpose for the Court to accept the PSR's approach.

Therefore, Hart only disputes topics and issues left open-ended in the PSR such that any effort to expand on the PSR's recommendations by the USAO or any surprise or misinterpretation of what is stated in the PSR's recommendations should be discouraged.  Hart's Sentencing Memorandum below is consistent with his previously-filed Response to the PSR.  His disagreement is only with the Government's tendency to stretch well beyond the PSR recommendations in many January 6 cases.

After discussion with the USAO, Timothy Hart pled guilty to one count of violating only 18 U.S.C. § 231(a)(3), which prohibits *(formatting modified for analysis):*

### 18 U.S. Code § 231 - Civil disorders

* * *

(a)(3) Whoever commits or attempts to commit

any act

to obstruct, impede, or interfere with any fireman or law enforcement officer

lawfully engaged in the lawful performance of his official duties

incident to and during the commission of a civil disorder

which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce

or the conduct or performance of any federally protected function

— Shall be fined under this title or imprisoned not more than five years, or both.

This is defined as:

### 18 U.S. Code § 232 - Definitions

For purposes of this chapter:

(1) The term "**civil disorder**" means any public disturbance involving acts of violence by assemblages of three or more persons, which causes an

immediate danger of or results in damage or injury to the property or
person of any other individual.

* * *

Said plea agreement with the United States is posted on the Court's electronic records at ECF Dkt. #

59, on April 21, 2023.  The Government prepared a "Statement of Offense" which has been posted as ECF

Dkt. # 60 filed on April 26, 2023.  The plea agreement includes stipulating to the Statement of Offense.

Defendant Hart does not intend to pick upon the PSR or its recommendations to any unreasonable

extent nor to raise any significant difficulty in completing the plea agreement.  The Government and Defendant

have stipulated to the Statement of Offense even if there are parts that perhaps each side would prefer to see a

little different.  Sentencing now is in fact guided by the Plea Agreement and the Statement of Offense

incorporated within it.  Again, Hart's decision to plead was strongly influenced and motivated by the Plea

Agreement document, the Statement of Offense, and the negotiations which the PSR reflects.

Defendant Hart does not fundamentally object to the U.S. Probation Office's analysis or

recommendations, but addresses the topics that could come to be in controversy from the prosecution in the

sentencing analysis due to areas left open-ended in the PSR.  The PSR's conclusions are so far in line with

what was expected in the plea agreement and discussions.

Nevertheless, the Government from time to time argues on sentencing factual assertions beyond what

has been established or stipulated to.  Furthermore, argument on sentencing can implicate interpretation, spin,

or gloss as to the facts in the Statement of Offense.

The Pre-Sentence Investigation Report reminds us as does Defendant that the Court has currently

scheduled the sentencing hearing on July 27, 2023, at 9:30 AM.

## II.   PROCEDURAL HISTORY AND CHARGES

Defendant Hart was charged by Superseding Indictment filed on January 26, 2022, at ECF

Dkt # 18, with six Counts:

**COUNT I:   18 U.S. Code § 231 –** *[Interfering with Law Enforcement during]* **Civil disorders**

* * *

 (a)(3) Whoever commits or attempts to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function

* * *

— Shall be fined under this title or imprisoned not more than five years, or both.

**COUNT II:   18 U.S. Code § 1512 - Tampering with a witness, victim, or an informant**

* * *

(**c**)Whoever ***corruptly***—

    (**1**)   alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

    (**2**) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,

shall be fined under this title or imprisoned not more than 20 years, or both.

* * *

*(Emphasis added).*

**COUNT III:  18 U.S.C. § 1752(a)(1):**

* * *

 (**a**)Whoever—

    (**1**) knowingly enters or remains in any restricted building or grounds without lawful authority to do so;

* * *

*[may be punished with up to one year in jail, fined, etc.]*

4

**COUNT IV:  18 U.S.C. § 1752(a)(2). Restricted building or grounds states:**

> (a) Whoever—
>> * * *
>> (2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engages in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when,  or so that, such conduct, in fact, impedes or disrupts the orderly conduct of  Government business or official functions
>
>> * * *

*[may be punished with up to one year in jail, fined, etc.]*


**COUNT V:  40 U.S. Code § 5104(e)(2)(D) - Unlawful activities in Capitol building**

> * * *
> (e) CAPITOL GROUNDS AND BUILDINGS SECURITY.—
>
>> * * *
> (2) VIOLENT ENTRY AND DISORDERLY CONDUCT.—An individual or group of individuals may not willfully and knowingly—
>
>> * * *
>> (D) utter loud, threatening, or abusive language, or engage in disorderly or disruptive conduct, at any place in the Grounds or in any of the Capitol Buildings with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct in that building of a hearing before, or any deliberations of, a committee of Congress or either House of Congress;
>
>> * * *
>> (G) parade, demonstrate, or picket in any of the Capitol Buildings.

**COUNT IV:  40 U.S.C. 5104(e)(2)(G) – Unlawful activities in Capitol building**
> * * *
> (e) CAPITOL GROUNDS AND BUILDINGS SECURITY.—
>> * * *

(2)**VIOLENT ENTRY AND DISORDERLY CONDUCT.—**An individual or group of individuals may not willfully and knowingly—

\* \* \*

 (G) parade, demonstrate, or picket in any of the Capitol Buildings.

\* \* \*

### III.   FACTUAL ALLEGATIONS NOT PROVEN NOR ESTABLISHED

Of course, to the extent that a factual allegation was unavoidably and necessarily found to be a fact by a trial jury – as an essential ingredient of a verdict -- before the jury could possibly have reached a verdict of guilt on a particular count, the Court is justified in treating that factual allegation as established within the jury's verdict.

Here we have a plea agreement with a Statement of Offense.

However, neither a jury's verdict nor a plea agreement is a blank check allowing the Government to make exaggerated factual statements.

Here, the only offense at issue is Count I which the Defendant pled guilty to.

For example, 18 U.S. Code § 231 is multi-pronged and applies either to an act to:

    a) **<u>obstruct</u>**,

    b) **<u>impede</u>**, or

    c) **<u>interfere with</u>**

        i.   any fireman or

        ii.   law enforcement officer

So did Defendant Hart "interfere with" a fireman or law enforcement officer?  Or did he "impede" such officer?  Or did he "obstruct" such officer?

We have only a very careful, unbiased, precise reading of the Statement of Offense – carefully avoiding seeing in the "ink blot test" what we imagine to be there rather than what actually is there.

Fortunately, if we stick to the PSR alone in this case, the PSR's presentation and Statement of

Offense support the Probation Office's analysis, conclusions, and recommendations here in this case.

Here, the Probation Office did it mostly right.  Yet any factual allegations asserted by the U.S. Attorney's Office (USAO) that were not part of the plea of guilt to Count I or explicitly stated in the Plea Agreement and its supporting Statement of Offense should not be credited.

The Government is not at liberty to add to the plea agreement a Christmas tree of ornaments that were not part of the plea agreement and not stipulated to.

## IV.   MAXIMUM PENALTY

A. The Maximum Penalty for a violation of 18 U.S. Code § 231 includes a maximum term of incarceration of five years.

B. Pursuant to 18 U.S.C. 3571(b)(3)**,** the maximum amount of a fine is $250,000.

Here, in this case, Defendant Hart did not commit any act nor was he charged with any crime of causing death or any bodily injury, which could be considered in assessing a fine.

C. In Hart's sentencing zone, the Court may consider a mix of various periods of probation, community service, and/or home confinement.

D. After serving any term of incarceration, supervised release of up to five years is possible. The term of supervision shall be no more than three years if the offense level is five or less.

E. A special assessment of paying $100 is mandatory

F. Drug testing appears to be mandatory.

Statute 18 U.S. Code § 3663 allows for an order that a Defendant pay restitution of "losses" "from the offense."  The Architect of the Capitol has offered estimates of $2,881,360.20 of damages to the United States Capitol.  But the maximum amount of restitution that could be statutorily ordered is

**18 U.S. Code § 3663 - Order of restitution** (in relevant part):

**(a)**

       * * *

   **(B)**

   **(i)**The court, in determining whether to order restitution under this section, shall consider—

     **(1)**  the amount of the loss sustained by each victim as a result of the offense; and

      * * *

Therefore, the maximum penalty for restitution is limited only to (a) the results of "the

offense" in question, not to what other people did or other things that happened, (b) which

constitutes a "loss," (c) to each victim – that is an identifiable victim.  Hart's counsel

recommends that any ordered payments be merely characterized as a fine instead.


### V.    SUMMARY OF RECOMMENDATIONS

The U.S. Probation Office explains and supports in detail the following key results which that

office recommends:

- Assigning a base offense level of 10 points for the count to which within the framework of the U.S. Sentencing Guidelines pursuant to §2X5.1 of the Sentencing Guidelines, analogizing the offense pled to under §2A2.4 of the Sentencing Guidelines to Obstructing Or Impeding Officers.  (Paragraph 36)

- For Acceptance of Responsibility, the PSR recommends a decrease of 2 points pursuant to §3E1.1(a).  (Paragraph 43.)

- No Specific Offense Characteristics were recommended.  (Paragraph 37.)

- No adjustment for role in the offense was recommended. (Paragraph 39.) The Probation Officer correctly analyzes and applies the Sentencing Guidelines in determining whether Hart "exercised managerial authority over any other participant." In many January 6 cases, the analysis is wrong.

  Whether a Defendant planned *himself* or *herself* is often confused with planning *the crime* overall.  Planning to wake up and have breakfast and get dressed does not qualify for the enhancement of extensive planning such as under USSG §§ 3B1.1 or 3B1.2.  One must be extensively involved in planning *the crime* and/or *the group committing the crime* to be considered for the enhancement.  Merely planning what clothes to wear (actually cited in some cases by prosecutors) or what roads to drive or where to stop for lunch for oneself is an incorrect view.

  Here, the PSR gets this right.  Planning a trip is not planning *the crime* of which he has pled guilty.  Planning one's own day, for example, could not be playing a leadership role in the crime.  Similarly, planning, preparation, or actions that would be normal for someone not planning any crime could not be considered.

- No adjustment for obstruction of justice was recommended. (Paragraph 40.)

- Therefore, the total offense level recommended is 8.  (Paragraph 44.)

- Assigning a criminal history category of I and adding 1 point for past criminal history.

- Based on the circumstances of this case, the Probation Office advises that a sentence of zero months to six months is proper and recommends the same range.  (Paragraph 104.)

- The PSR advises that the maximum term of imprisonment possible is five years.

- The Probation Office further advises that no sentence of imprisonment is required. (Paragraph 105.)

- The Office asserts that under §5E1.2(a) the Court "shall" impose a fine in all cases unless the Defendant establishes that "he is unable to pay and is not likely to become able to pay at any time," which presumably includes by reference to the amount of a proposed fine not merely all or nothing.

- The PSR advises that the maximum fine that may be imposed is $250,000.  Under 18 U.S.C. 3571(b)(3).

- The PSR advises that the guideline amount of the fine should be in the range of $2,000 to $20,000 under USSG.  §5E1.2(c)(3).

- Naturally, however, Defendant Hart like the average person would prefer even an onerous fine over incarceration.

- That Office further recommends that Defendant Hart pay restitution of an additional $2,000 to the Architect of the Capitol toward the estimated $2,881,360.20 of damages to the United States Capitol claimed.

- Supervised release of up to five years is possible that Office advises.  The term of release shall be no more than three years if the offense level is five or less.

- The Probation Office recommends supervised release (probation) of one year, which the PSR identifies as the minimum amount required.

- The Court may impose all or a combination of the additional conditions of (a) payment of restitution, (b) financial disclosure, (c) community service in lieu of a fine, (d) no possession of or access to firearms and/or dangerous weapons during supervision, (e) monitoring technology for a period of 90 days, (f) following the rules and regulations of the location monitoring program, and (g) substance abuse testing to ensure continued abstinence from illicit substances.

- Drug testing which the Probation Office believes to be mandatory.

- A special assessment of paying $100 is mandatory that Office believes.

## VI.  DEFENDANT'S POSITION AND REQUEST

Defendant Hart generally agrees with the recommendations of the Probation Office in its PSR, with the minor exceptions that --

- Hart provided extensive financial information to the Probation Office but they also wanted him to provide contact information of other people he knows that they could contact.  Hart resisted that portion including because he lacked the trust that the Government would not simply use that to harass or incriminate more people.

- Naturally, Hart would rather pay a fine at the high end of the Probation Office's recommendation of $2,000 to $20,000 (or $22,000 if the recommended $2,000 restitution is characterized instead as a fine) if his time incarcerated could be at the low end of the PSR's recommended 0 to 6 months in prison.

- However, Hart and his family would not be able to write a check for a large fine immediately.  Hart would request the opportunity to set up a suitable payment plan even if that requires justifying his cash flow ability to pay over time as opposed to immediately. Hart would not dispute the recommended fine as the Court may find it, but might not be able to pay immediately all at once.  It is likely that circumstances over time might be more able to support a fine than his current situation of legal fees, disruptions for legal proceedings, etc., compared with focusing simply on work later.

- The PSR recommends 0 to 6 months, and Hart would request 3 to 4 months, in consideration of being willing to pay a fine at the higher end.

- Hart also would agree to an additional obligation to engage in community service in the North end of Dayton, Ohio, near where he currently resides.  Counsel notes that on occasion the need arises of course to transfer locations for job possibilities or other

considerations.

- Any supervision after release should be made very clear as to its terms to avoid
  burdening the courts or the Defendant with any disputed or unclear issues, effectively
  not ending the case but kicking it down the road.  Defendant and counsel would
  recommend excluding traffic infractions (deliberately worded as distinct from any
  actual crime that happens to be traffic related being a higher level.)  Counsel would
  recommend excluding administrative or paperwork offenses.  In one case, one of this
  firm's defendants had listed in his reported prior criminal history a failure to file a
  sales tax form for his business.  Surely the Court system has better things to do than re-
  open a case for something of that nature.  The intent of supervision is for something
  more serious or especially threatening to the safety of the public, or, of course
  evidencing any intent of re-offending the original offense.  Likewise when a state or
  local authority does not choose to charge a potential crime, the supervised release
  process should for many reasons give great deference to the decision of state and local
  authorities under federalism as well as their factual knowledge closer to the events.

- Defendants sometimes report difficulty in getting through to probation officers to
  report something (in one case a car accident) and such officers deserve their personal
  time and/or time off as much as anyone.  Counsel would recommend a device such as
  dropping notice in the mail to protect a Defendant against a claim of an untimely
  disclosure.

- As a generic principle, counsel commonly would recommend the precise
  implementation of substance abuse testing and such matters to be guided by the actual
  expertise and observations of the relevant probation officers and other professionals.

That is not a disagreement with the recommendation except that the professionals

should be granted the latitude to apply their determinations.

## VII.  GOVERNING LAW FOR SENTENCING UNDER 18 USC 3553(a) FACTORS

Federal law codified at 18 U.S.C. § 3553 "Imposition of a Sentence" authorizes a federal court

to impose a sentence upon the conviction of a defendant for a crime, including by a plea of guilty, in

accordance with that statute's terms and the guidelines promulgated by the U.S. Sentencing

Commission under it authority at law.  Factors governing sentencing are stated in 18 U.S.C. 3553(a).

## VIII. FACTUAL DISPUTES WHICH MAY AFFECT SENTENCING DECISIONS

Sometimes sentencing depends upon specific facts which have not been established and/or

disputed, even outside the trial or even though the trial or a plea deal are concluded.

The U.S. Sentencing Commission, Guidelines Manual, Annotated 2021 Chapter 6 -

Sentencing Procedures, Plea Agreements, And Crime Victims' Rights explains:[1]

Commentary

Although lengthy sentencing hearings seldom should be necessary, ***disputes about sentencing factors must be resolved with care***.  When a dispute exists about any factor important to the sentencing determination, ***the court must ensure that the parties have an adequate opportunity to present relevant information.***  Written statements of counsel or affidavits of witnesses may be adequate under many circumstances.  See, e.g., United States v. Ibanez, 924 F.2d 427 (2d Cir. 1991).  ***An evidentiary hearing may sometimes be the only reliable way to resolve disputed issues***.  See, e.g., United States v. Jimenez Martinez, 83 F.3d 488, 494-95 (1st Cir. 1996) (finding error in district court's denial of defendant's motion for evidentiary hearing given questionable reliability of affidavit on which the district court relied at sentencing); United States v. Roberts, 14 F.3d 502, 521(10th Cir. 1993) (remanding because district court did not hold evidentiary hearing to address defendants' objections to drug quantity determination or make requisite findings of fact regarding drug quantity); see also, United States v.

---

[1]    **https://www.ussc.gov/guidelines/2021-guidelines-manual/annotated-2021-chapter-6**

_Fatico_, 603 F.2d 1053, 1057 n.9 (2d Cir. 1979), cert. denied, 444 U.S. 1073 (1980).  The sentencing court must determine the appropriate procedure in light of the nature of the dispute, its relevance to the sentencing determination, and applicable case law.

In determining the relevant facts, sentencing judges are not restricted to information that would be admissible at trial.  See 18 U.S.C. § 3661; see _also United States v. Watts_, 519 U.S. 148, 154 (1997) (holding that lower evidentiary standard at sentencing permits sentencing court's consideration of acquitted conduct); Witte v. United States, 515 U.S. 389, 399-401 (1995) (noting that sentencing courts have traditionally considered wide range of information without the procedural protections of a criminal trial, including information concerning criminal conduct that may be the subject of a subsequent prosecution); Nichols v. United States, 511 U.S. 738, 747-48 (1994) (noting that district courts have traditionally considered defendant's prior criminal conduct even when the conduct did not result in a conviction). Any information may be considered, so long as it has sufficient indicia of reliability to support its probable accuracy.  Watts, 519 U.S. at 157; Nichols, 511 U.S. at 748; United States v. Zuleta-Alvarez, 922 F.2d 33 (1st Cir. 1990), cert. denied, 500 U.S. 927 (1991); United States v. Beaulieu, 893 F.2d 1177 (10th Cir.), cert. denied, 497 U.S. 1038 (1990).  Reliable hearsay evidence may be considered.  United States v. Petty, 982 F.2d 1365 (9th Cir. 1993), cert. denied, 510 U.S. 1040 (1994); United States v. Sciarrino, 884 F.2d 95 (3d Cir.), cert. denied, 493 U.S. 997 (1989).  Out-of-court declarations by an unidentified informant may be considered where there is good cause for the non-disclosure of the informant's identity and there is sufficient corroboration by other means.  United States v. Rogers, 1 F.3d 341 (5th Cir. 1993); see also United States v. Young, 981 F.2d 180 (5th Cir.), cert. denied, 508 U.S. 980 (1993); United States v. Fatico, 579 F.2d 707, 713 (2d Cir. 1978), cert. denied, 444 U.S. 1073 (1980).  Unreliable allegations shall not be considered.  United States v. Ortiz, 993 F.2d 204 (10th Cir. 1993).

_Id. (Bolded and italicized emphases added)._


## IX.   GENERAL FACTORS AFFECTING SENTENCING DECISIONS

The Court may consider the factors under 18 U.S.C. § 3553(a) in crafting a sentence that is clearly at the low end of the sentencing range.  As typically asserted by the USAO, these factors of that statute include:

(1)   the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)  the need for the sentence imposed—

(A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)   to afford adequate deterrence to criminal conduct;
(C)   to protect the public from further crimes of the defendant; and
(D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

Yet "these offenses."  referred to in 18 U.S.C.§ 3553(a) here is **18 U.S. Code § 231.**

The Court is asked to review and recall that 18 U.S. Code § 231 applies to obstructing, impeding, or interfering with – not what has been often alleged of January 6 "rioters."

The USAO consistently wants to analyze "the nature and circumstances" of offenses by other people, which Defendant Hart did not commit, is not guilty of, and which form no part of what is currently before the Court now.  The "nature … of the offense" concerns the offense in particular of 18 U.S. Code § 231, of (1) obstructing, (2) impeding, or (3) interfering with.

a.  The "circumstance of the offense" concerns the offense in particular of 18 U.S. Code § 231, not other crimes of which he has not been found guilty.

b.  The need for the sentence imposed "to reflect the seriousness of the offense" concerns the offense in particular of 18 U.S. Code § 231, not other crimes of which he has not been found guilty.

c.  The need for the sentence imposed "to promote respect for the law," concerns the offense in particular of 18 U.S. Code § 231, not other crimes of which he has not been found guilty.

d.  The need for the sentence imposed "to provide just punishment for the offense," concerns the offense in particular of 18 U.S. Code § 231, not other crimes of which he

has not been found guilty.

e.  The need for the sentence imposed "to afford adequate deterrence to criminal

conduct," concerns the offense in particular of 18 U.S. Code § 231, not other crimes of

which he has not been found guilty.  In fact, the widespread certainty that left-wing

demonstrators will never be punished and only conservative demonstrators will

encourages more criminal conduct than any baseline.

f.  The need for the sentence imposed "to protect the public from further crimes of the

defendant," concerns the offense in particular of 18 U.S. Code § 231, not other crimes

of which he has not been found guilty.

Indeed, to sentence Hart as if he committed the very serious crimes charged against others of

assaulting police officers, damaging federal property, and brawling with police or worse would

actually – and actually does in fact – promote disrespect for the law.


### X.   CRIMINAL HISTORY

a.  The U.S. Sentencing Guidelines require that:

### §4A1.2.   <u>Definitions and Instructions for Computing Criminal History</u>

#### (a)   <u>Prior Sentence</u>

(1)   The term "prior sentence" means any sentence previously imposed upon adjudication of guilt, whether by guilty plea, trial, or plea of <u>nolo contendere</u>, for conduct not part of the instant offense.

(2)   If the defendant has multiple prior sentences, determine whether those sentences are counted separately or treated as a single sentence. Prior sentences always are counted separately if the sentences were imposed for offenses that were separated by an intervening arrest (<u>i.e.</u>, the defendant is arrested for the first offense prior to committing the second offense). If there is no intervening arrest, prior sentences are counted separately unless

(A) the sentences resulted from offenses contained in the same charging instrument; or (B) the sentences were imposed on the same day. Treat any prior sentence covered by (A) or (B) as a single sentence. See also §4A1.1(e).

For purposes of applying §4A1.1(a), (b), and (c), if prior sentences are treated as a single sentence, use the longest sentence of imprisonment if concurrent sentences were imposed. If consecutive sentences were imposed, use the aggregate sentence of imprisonment.

\* \* \*

(e)     Applicable Time Period

(1)     Any prior sentence of imprisonment exceeding one year and one month that was imposed within fifteen years of the defendant's commencement of the instant offense is counted. Also count any prior sentence of imprisonment exceeding one year and one month, whenever imposed, that resulted in the defendant being incarcerated during any part of such fifteen-year period.

\* \* \*

Furthermore,

(2)     Any other prior sentence that was imposed within ten years of the defendant's commencement of the instant offense is counted.

(3)     ***Any prior sentence not within the time periods specified above is not counted.*** (Emphasis added.)

\* \* \*

b.  The PSR assigns only one point for past criminal history, while reciting in exhaustive detail the particulars of matters which do not affect sentencing at present.  In the whole, Hart could chase down every particular but is willing to go with the 1 point.

## XI. "GUILTY VIEWING" OF CRIMES OF OTHERS or SEEING VIOLENCE

The Government has developed a concept of attempting to accuse and punish people for seeing violence committed by others which the accused had nothing to do with.   This idea of

16

punishing "guilty viewing" requires scrutiny.

The Government apparently misunderstands a split decision on April 6, 2022, by the Honorable District Court Judge Trevor McFadden, including in *United States v. Matthew Martin*, Case No. 1:21-cr-00394, in this District.  Judge McFadden found Matthew Martin not guilty because the U.S. Capitol Police had not given notice to the public of a restricted area under 18 U.S.C. 1752(a)(1) (that is, notice that had been posted on flimsy 11 inch by 14 inch paper was no longer visible after efforts by some to remove barricades) and police officers did not express any discouragement of Martin entering the Capitol.

But McFadden found another Defendant had evaded a "cordon" of police officers sufficiently to violate the designation of a restricted area by a "cordon" of police in 18 U.S.C. 1752.

Thus seeing police officers *who are marking a restricted line by a cordon* (explicitly referenced in the statute) has nothing to do with whether a Defendant saw police officers.  There is no legal requirement for Hart to run away upon seeing police officers.  There is no requirement to flee an area upon hearing an alarm sounding.  Most people's experience with a building alarm is either (a) a hotel fire alarm which goes off and everyone goes outside to the parking lot and waits while the fire department comes and finds nothing wrong and everyone goes back in to their hotel rooms wondering what that was all about, or (b) a high school hooligan wants to ditch class and go to the beach or didn't study for an exam and pulls the high school building fire alarm.  The idea that hearing an alarm requires people to run away finds no purchase in American law.  A Good Samaritan might call 911 until seeing that police were already on the scene.

It is not a crime to see other people committing violence.  18 U.S.C. 1752 does not require anyone to turn around and leave upon seeing someone misbehaving.  Seeing guilt does not create guilt.  Seeing people brawling would lead a reasonable person to conclude that those people will be

arrested while the overwhelming majority of demonstrators may continue to exercise their rights.

## XII.   CIRCUMSTANCES – MISCHARACTERIZING THE CAPITOL

Here, the Government repeats its narrative of what some people – not Hart – did on or about

January 6, 2021, at or near the U.S. Capitol and/or its grounds.  The Government's narrative is not

supported by admissible facts in many respects.

As Federal courts in this District have reasoned in reaching legal conclusions:

> ***The Capitol Grounds*** (excluding such places as the Senate and House floors, committee rooms, etc.) ***have traditionally been open to the public***; indeed, thousands of people visit them each year. Thus, we cannot agree with the defendants that the Capitol Grounds have ever been characterized by the serenity and quiet of a hospital or library.

*Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575 (D.D.C. 1972) *(emphases added).*

> The courts in this jurisdiction have long recognized that ***"[t]he United States Capitol is a unique situs for demonstration activity"*** and ***"is a place traditionally open to the public thousands visit each year to which access cannot be denied broadly or absolutely,*** [a fact which must be weighed] against the government's interest in protecting against possible `damage to buildings and grounds, obstruction of passageways, and even dangers to legislators and staff.'" *Kroll v. United States*, 590 F. Supp. 1282, 1289, 1290 (D.D.C.1983) (*quoting Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575, 583-85 (D.D.C.), *aff'd mem.*, 409 U.S. 972, 93 S. Ct. 311, 34 L. Ed. 2d 236 (1972)).

*Wheelock v. United States* 552 A.2d 503, 506 (D.C. 1988) *(emphases added).*

So very public is the Capitol, that built into the physical building from its initial construction

are public viewing galleries allowing any member of the public – for no reason other than a desire to

watch their Representatives and Senators at work – may sit and watch the House of Representatives

and the U.S. Senate while in session. [23]  There is no physical barrier – even to this day – between the

---

[2]      See:  Large Public Galleries in New Legislative Chambers, Library of Congress exhibit, **https://www.loc.gov/exhibits/uscapitol/s5.html** :  Thomas U. Walter. "Details of Gallery in Hall of Representatives," 1856. Ink and water color on paper. Architect of the Capitol (204)

Chambers in session and the public watching from the balcony galleries.  If a member of the public wished to – not advisable, of course – toss a candy bar down to his willing U.S. Senator, the physical structure of the Senate chambers would make that possible.

Not only are the Capitol Grounds a national park, but the Capitol building is a museum in which hangs some of our nation's most iconic historic art.[4]

### XIII. WHAT THE COURT MAY NOT CONSIDER:  CROWD LIABILITY

Defendant Hart has taken responsibility and pled guilty to what he did.

The question is whether the Government may persuade the Court to punish him for what he did not do, such as what other people did.

A few hundred people out of the crowd of 10,000 committed violence against people and things, battled with police, injured about 140 police officers, damaged federal property at the Capitol, and some even tried to break through the doors to the Senate and House chambers.

However, here, in this case, the security camera video – that is, the Government's own evidence – shows with unmistakable clarity and precision that most of those who intruded into the U.S. Capitol building clearly had no plans whatsoever, no sense of direction, no commonality, etc.[5]

Crowds do not do things.  Individuals do things.  Crowds do not.

> This is where things fall apart. Although both Governor DeSantis and Sheriff
> Williams argue that the phrase "willfully participate" is commonly
> understood, neither party offers an actual definition. Is it enough to stand

---

[3]      This is changed only in the sheer quantity of citizens in our growing nation and the number of persons who want to watch from the viewing galleries, leading to time limits for rationing.  But the public purpose of the U.S. Capitol has been set since the first construction blueprints were drawn.

[4]      **https://www.aoc.gov/explore-capitol-campus/buildings-grounds/capitol-building/rotunda**

[5]      *See,* Capitol Security camera video, produced by USAO as 7029 USCS 02 Rotunda Door Interior-2021-01-06_15h15min01s000ms.mp4 from USCP OPR Report 21-007, Exhibit 6 CCTV Recordings, from production DT_DocID: USCP-003-00000167, produced 11/18/2021, in Global Production DOJCB_008

passively near violence? What if you continue protesting when violence
erupts? What if that protest merely involves standing with a sign while others
fight around you? Does it depend on whether your sign expresses a message
that is pro- or anti-law enforcement? What about filming the violence? What
if you are in the process of leaving the disturbance and give a rioter a bottle of
water to wash tear gas from their eyes?

The Governor would have this Court pencil in an exception for a person who
merely "attend[s]" a violent demonstration but does not actively engage in
violence or conduct that poses an imminent risk of injury or property damage.
ECF No. 99 at 13. But the Governor offers no explanation or construction that
limits when mere attendance becomes participation, except that a person must
"intend to commit violence." Id. But this ignores the plain text of the statute,
which separates a person from an assembly of three or more persons sharing
that intent. See *infra*.

*See, The Dream Defenders, et al., v. Ron DeSantis, 21-cv-191, ECF No. 137 (N.D. Fla. Sept. 9,
2021), (Mark E. Walker, Chief United States District Judge)*, Page 53 *(injunction against anti-riot
law in part because the legislation appeared to criminalize the defendant's protest activities even if
he did not participate in the violent acts of others)*, attached as __Exhibit__.  And continuing:

If this Court does not enjoin the statute's enforcement, ***the lawless actions of
a few rogue individuals could effectively criminalize the protected speech of
hundreds, if not thousands, of law-abiding Floridians***. This violates the First
Amendment. See, e.g., *Bible Believers v. Wayne Cnty.*, Mich., 805 F.3d 228,
252 (6th Cir. 2015). Florida's interest in preventing public violence is beyond
question, but when that interest collides with rights guaranteed by the First
Amendment, the "government may regulate in the area only with narrow
specificity." *Button*, 371 U.S. at 433. Otherwise, those rights, which "are
delicate and vulnerable, as well as supremely precious in our society," may be
suffocated. Id. Section 870.01(2), through its ambiguity, chills speech and
eviscerates that essential breathing space. The law is overbroad.[27]

Accordingly, I conclude that Plaintiffs have established a substantial
likelihood of success on the merits as to their overbreadth claim.

*Id.,* at Page 77 *(emphases added)*.

Collectivist punishment is not permitted nor constitutional within U.S. criminal law.  With

rare exceptions inapplicable here (such as hiring someone to commit a criminal act), no person under

the U.S. Constitution may be convicted or sentenced for what other people did.

### XIV.   DEFENDANT OBJECTS TO CRIMINALIZATION OF HIS POLITICAL SPEECH AND VIEWS

The Government continues its tendency to present political opinions or protected speech as evidence that the Defendant is a criminal.  The Government passes this off as tangentially related to proving the elements of a crime, but spills over quite extensively into pure free speech issues.

Despite what might be hypothetically true in some other case, the accusations of Hart's expression of free speech here are simply not – in fact – necessary to nor supportive of finding guilt of any non-speech crime.  They are mentioned as being part of proof of the crime, but Defendant responds that they are actually not.  The parading of many Defendant's political views as being in conflict with the views of juries, judges, and/or the USAO is untethered from any need to prove an element of a charged crime.  They are held up merely to induce ridicule by those who disagree.

### XV.   AVOIDING UNDUE DISPARITIES IN SENTENCING: AVOIDING DISPARITIES IN SENTENCING BY CONSIDERING ONLY JANUARY 6 RELATED CRIMES

In pursuit of the U.S. Sentencing Guidelines' primary purpose of minimizing disparities in sentencing, the PSR's paragraph 131 makes reference to the Government's error of considering only January 6 cases.  The Court must minimize disparities among all cases from the same charge, not merely among January 6 prosecutions.  That would produce the opposite result of the U.S. Sentencing Guidelines' very purpose.

The Probation Office, DoJ, USAO, and the Court must compare every January 6 sentencing not merely to other January 6 cases but to all cases under which a Defendant is sentenced for the same criminal charge, here 18 U.S.C. 231(a)(3) – present in all of the examples cited.  The relevant comparison is not a self-referential loop of only January 6 cases.  Sentencing consistent only with

January 6 cases but highly discordant of other cases would not fulfill the purposes of the U.S.

Sentencing Reform Act of 1984.

This apparently flows from the unsupportable idea that demonstrations that got out of control

at the Capitol are unique and nothing like them have ever happened before.  This is untrue:



In May to June 2020, rioters and insurrectionists attacked the White House from their rallying

point at Lafayette Square, **injuring 60 Secret Service agents**,[6] comparable to or worse than January

6, 2021.[7]  At least 155 law enforcement officers were injured by the insurrection and attack on the

---

[6]     Melissa Barnhart, , "Historic St. John's Church near White House torched by rioters," <u>Christian Post</u>, June 1, 2020, accessible at: **https://www.christianpost.com/news/historic-st-johns-episcopal-church-set-on-fire.html**

[7]     Jon Lockett,"AT DON'S DOOR 50 Secret Service agents injured in White House riots as Donald Trump is taken to 'terror attack' bunker," THE SUN, June 1, 2020, **https://www.thesun.co.uk/news/11752998/trump-secure-bunker-friday-george-floyd-protests-white-house/**

White House May to June 2020,[8] contrasted with around 114 at the Capitol on June 6, 2021.[9]

> "They were battling over the fences," [Attorney General Bill] Barr said. "They were trying to get entry. They were throwing bricks and inflammable liquid at the police. One fifth of the- there have been 750 officers hurt in the last week. One fifth of those have been in Washington, D.C. Most of those have been federal officers at Lafayette Park."
>
> Later in the interview, Barr repeated the claim.
>
> "All I heard was comments about how peaceful the protesters were," he said on June 7. "I didn't hear about the fact that there were 150 law enforcement officers injured, and many taken to the hospital with concussions. So, it wasn't a peaceful protest. We had to get control over Lafayette Park, and we had to do it as soon as we were able to do that."

WUSA9 News' "Verify Team" contacted law enforcement agencies who responded to the insurrection at the White House and were told that at least 155 injured officers and agents "so far" have been identified from the violent attack upon the White House.

So, under the U.S. Sentencing Act of 1984 and the U.S. Sentencing Guidelines, this Court's duty is to equalize sentencing as much as possible cannot ignore the most serious attack upon the U.S. Government since the bombing in the U.S. Capitol in 1983, the street war against the White House… not January 6, 2021, at the Capitol.

By some accounts, more officers were injured in the anarchist and left-wing assault on the White House than were injured on Capitol Hill on January 6, 2021.[10]  This of course is not a

---

[8]     "VERIFY: **Yes, at least 150 local and federal officers were injured during the first week of protests in DC,**" WUSA9, June 11, 2020, **https://www.wusa9.com/article/news/verify/150-local-federal-officers-injured-during-dc-protests-verify/65-8fdaf04e-df2e-47d0-abd6-a47017a699f8**
[9]     Whitney Wild, "**Dozens more US Capitol Police officers were injured on January 6 than previously known, report says,**" CNN, March 7, 2022**,** https://www.cnn.com/2022/03/07/politics/capitol-police-injuries/index.html

[10]    Olafimihan Oshin, "GAO says 114 Capitol Police officers reported injuries on Jan. 6," THE HILL, March 7, 2022, **https://thehill.com/homenews/state-watch/597258-gao-says-114-capitol-police-officers-reported-injuries-far-more-than/**

competition.  Neither is it acceptable.  But the U.S. Sentencing Act of 1984 requires the Judiciary to assure the public that cases are being treated equally including on sentencing.  (Sentencing disparities became a big controversy prior to the Act.)

The USAO attempts to portray events on January 6, 2021, on Capitol Hill as unique and threatening.  Yet America's international enemies and friends watched[11] as the U.S. Government and its worldwide military power were paralyzed by anarchist rioters.[12]  These rioters obstructed official proceedings at the White House in violation of 18 U.S.C. 1512(c)(2) interfering with and impeding the world-wide military chain of command of the U.S. Government.[13]

Not only did the U.S. Department of Justice drop the charges those arrested but rioters sued the District of Columbia and won millions of dollars in settlements of civil suits.[14]  The Court needs to reconcile this treatment somehow with the current spate of January 6 cases.

---

[11]    2020 Marissa J. Lang , Antonio Olivo , Rachel Chason and John Woodrow Cox, "**Night of destruction across D.C. after protesters clash with police outside White House,"** The Washington Post, June 1, 2020, https://www.washingtonpost.com/local/dc-braces-for-third-day-of-protests-and-clashes-over-death-of-george-floyd/2020/05/31/589471a4-a33b-11ea-b473-04905b1af82b_story.html

[12]    Shawn McCreesh, "**Protests Near White House Spiral Out of Control Again: Washington's mayor imposed a curfew and activated the National Guard, but the demonstrations over the killing of George Floyd turned into a repeat of the previous night**," New York Times, May 31, 2020, ("Hundreds of people surged in front of the White House for a third straight night on Sunday."), **https://www.nytimes.com/2020/05/31/us/politics/washington-dc-george-floyd-protests.html**

[13]    Marina Pitofsky, "**Protesters knock down White House security barricades as tensions mount over Floyd's death**," The Hill, May 30, 2020, **https://thehill.com/homenews/news/500299-protestors-knock-down-white-house-securitys-barricade-as-tensions-mount-over/**

[14]    *See*:  Aila Slisco, "Government Settles Civil Cases With Protesters Injured at Lafayette Square," NEWSWEEK, April 13, 2022, accessible at:  **https://www.newsweek.com/government-settles-civil-cases-protesters-injured-lafayette-square-1697820**

Unfortunately, January 6, 2021, was far from unusual, nor was it anywhere close to the worst demonstration run amok.  Failing to pursue similarities in sentencing do not find excuse.

In January 2017, rioters burned police cars, limousines, stores, and the like professing their plans to prevent President Donald Trump from assuming the office of the President.  Hundreds were arrested but then released with most charges dropped.





**More Than 200 Arrested in D.C. Protests on Inauguration Day**

217 people were arrested and six police officers suffered minor injuries after some protesters set fires and smashed windows in the nation's capital.

— Police and demonstrators clash in downtown Washington, D.C. after a limo was set on fire following the inauguration of President Donald Trump on Jan. 20. Spencer Platt / Getty Images

**Washington (CNN)** — Six police officers were injured and 217 protesters arrested Friday after a morning of peaceful protests and coordinated disruptions of Donald Trump's inauguration ceremony *gave way to ugly street clashes in downtown Washington.*

*At least two DC police officers and one other person were taken to the hospital after run-ins with protesters*, DC Fire Spokesman Vito Maggiolo told CNN. Acting DC Police Chief Peter Newsham said the officers' injuries were considered minor and not life threatening.

Bursts of chaos erupted on 12th and K streets as black-clad "antifascist" protesters ***smashed storefronts and bus stops, hammered out the windows of a limousine and eventually launched rocks at a phalanx of police lined up in an eastbound crosswalk.*** Officers responded by launching smoke and flash-bang devices, which could be heard from blocks away, into the street to disperse the crowds.

Gregory Krieg, "**Police injured, more than 200 arrested at Trump inauguration protests in DC**," CNN, Updated January 21, 2017, accessible at: **https://www.cnn.com/2017/01/19/politics/trump-inauguration-protests-womens-march** *(Emphases added.)*



*Also see* Phil McCausland, Emmanuelle Saliba, Euronews, Erik Ortiz and Corky Siemaszko, "**More Than 200 Arrested in D.C. Protests on Inauguration Day:  217 people were arrested and six police officers suffered minor injuries after some protesters set fires and smashed windows in the nation's capital,**" <u>NBC News</u>, January 21, 2017, accessible at: **https://www.nbcnews.com/storyline/inauguration-2017/washington-faces-more-anti-trump-protests-after-day-rage-n709946**

But then: "**GOVERNMENT DROPS CHARGES AGAINST ALL**

**INAUGURATION PROTESTERS**," <u>NBC News</u>, July 6, 2018,  accessible at:

**https://www.nbcnews.com/news/us-news/government-drops-charges-**

**against-all-inauguration-protesters-n889531**

In 2011, rioters entered and physically occupied the Wisconsin State legislature, followed by months of disruptive protests mostly outside but also inside the Capitol building of Wisconsin.[15] Those who sought to obstruct official proceedings to prevent the passage of legislation they disapproved of were mostly not arrested or given minor fines or probation.  As in every such non-January 6 case, there is no dispute about the goals or organizing which were proudly and openly admitted in Wisconsin.  The organizers proudly and openly admitted and bragged that they intended

---

[15]     "Thousands storm Capitol as GOP takes action," <u>Wisconsin State Journal</u>, March 10, 2011, updated February 19, 2015, ("Thousands of protesters rushed to the state Capitol Wednesday night, forcing their way through doors, crawling through windows and jamming corridors"), accessible at: **https://madison.com/wsj/news/local/govt-and-politics/thousands-storm-capitol-as-gop-takes-action/article_260247e0-4ac4-11e0-bfa9-001cc4c03286.html**

to shut down the Wisconsin State legislature to stop the passage of laws they disagreed with.

In 2023, State legislatures in Florida, Montana, Tennessee were physically disrupted by protestors against Republican legislation, but the DoJ has taken no action to defend these official proceedings.

In September 2018, opponents of Judge Brett Kavanaugh's nomination to the U.S. Supreme Court openly and publicly organized and advertised their plans to obstruct an official proceeding in violation of 18 U.S.C. 1512(c)(2) by shutting down the U.S. Senate Judiciary Committee's hearings and confirmation of Kavanaugh to become a Supreme Court Justice. Where the Department of Justice merely suspects and speculates about January 6 Defendants, anti-Kavanaugh rioters openly admitted it. Protestors celebrated on line occupying and taking over the Hart Senate Office Building.  The 2018 demonstrators proudly admitted their conspiracy to obstruct congressional proceedings: [16]

> "It's sort of a coordinated dance, **but the performers are an organized group of protesters** and a dozen or so uniformed Capitol Police officers. And the stage is this week's Senate confirmation hearings for Supreme Court nominee Brett Kavanaugh." One by one, the protesters, many wearing T-shirts reading 'I am what's at stake,' interrupt the proceedings by shouting slogans like 'You're making a mockery of democracy!' or 'Senators: Do your jobs and stop this hearing!' The police then warn that further disruption will result in arrests. Minutes later, the person shouts again and is hustled out a side door…**the protesters are part of a nationwide campaign to disrupt the confirmation process**."

*Id. (Emphasis added).*

The few of those Left-wing insurrectionists arrested [17] were released on a $35 to $50 bail after 5 hours which became their sole punishment in most cases after their cases were dropped. [18]

---

[16]    Note that the statute of limitations will not expire until September 26, 2023, and the USAO could prosecute these rioters using a consistent standard as to January 6, 2021.

[17]    Emily Birnbaum, "Over 200 protesters arrested during Kavanaugh hearings," The Hill, September 6, 2018, accessible at:  **https://thehill.com/homenews/senate/405500-212-protesters-total-arrested-during-**

*See,* **https://twitter.com/womensmarch/status/1047935356673437697** (hear the extreme noise of

the alarms and crowd disrupting the Hart Building in the video).  See

**https://www.facebook.com/watch/?v=2314502548791821**



*Erin Franczak and Katherine Tully-McManus,  "'**I See You, Senators':**
**Kavanaugh Protesters Pour Into the Capitol:** Supporters of Christine
Blasey Ford **sing, raise fists, invoke regression analysis**," <u>Roll Call</u>,
September 27, 2018, accessible at:  **https://rollcall.com/2018/09/27/i-see-**
**you-senators-kavanaugh-protesters-pour-into-the-capitol/** And:  Sophie
Tatum, "More than 300 protesters arrested as Kavanaugh demonstrations
pack Capitol Hill," October 5, 2018, accessible at:
**https://www.cnn.com/2018/10/04/politics/kavanaugh-protests-us-capitol***



___

**kavanaugh-hearings**;
[18]     Ashraf Khalil, "Protesters continue to interrupt Kavanaugh hearings," Associated Press, 09/06/2018, accessible
at:  **https://apnews.com/article/3f4ddaec0ee946fe817329b065af3408; accessed Nov 6, 2021;**
*emphasis added.*



During that riot, Sen. Schumer led a crowd at the closed doors of the U.S. Supreme Court at which rioters banged on the doors of the U.S. Supreme Court.  Sen. Chuck Schumer openly threatened Justices of the U.S. Supreme Court,

> "'I want to tell you Gorsuch, I want to tell you Kavanaugh - you have released the whirlwind, and you will pay the price. You won't know what hit you if you go forward with these awful decisions,'

Schumer told the cheering crowd.  Thus, Senator Schumer attempted to obstruct or corruptly influence the decisions of the U.S. Supreme Court in violation of 18 U.S.C.1512(c)(2).  By contrast, January 6 Defendants dispute the charges against them and evidence against them is scarce. [19]

Therefore, it is an error now for the U.S. Probation Office, Department of Justice, and/or U.S.

---

[19]    https://www.reuters.com/article/us-usa-court-abortion-scene/u-s-chief-justice-slams-schumer-for-dangerous-comment-on-justices-in-abortion-case-idUSKBN20R2KX

Attorney's Office to compare the sentencing of January 6 Defendants only to other January 6 cases.

This arbitrary analysis is precisely in conflict with the U.S. Sentencing Guidelines' reason for

existing.

Dated:  July 20, 2023                         RESPECTFULLY SUBMITTED
                                              **TIMOTHY ALLEN HART,** *By Counsel*


                                              _____/s/__John M. Pierce_____
                                              John M. Pierce, Esq.
                                              John Pierce Law Firm
                                              21550 Oxnard Street
                                              3rd Floor, PMB #172
                                              Woodland Hills, CA 91367
                                              Tel: (213) 400-0725
                                              Email: *jpierce@johnpiercelaw.com*
                                              Attorney for Defendant


## CERTIFICATE OF SERVICE

I hereby certify that this document is being filed on this July 20, 2023, with the Clerk of the Court by using the U.S. District Court for the District of Columbia's CM/ECF system, which will send an electronic copy of to the following CM/ECF participants.  From my review of the PACER account for this case the following attorneys are enrolled to receive notice and a copy through the ECF system.

MATTHEW M. GRAVES
United States Attorney

Joseph H. Huynh, Esq.
United States Attorney's Office
For the District of Columbia
601 D. Street, NW
Washington, DC 20530
joseph.huynh@usdoj.gov
Telephone:  (202) 252-7215

**Samantha Ritvo Miller**
USAO District of the District of Columbia
601 D Street NW
Washington, DC 20001
(202) 252-7014
Email: samantha.miller@usdoj.gov

_____/s/_____
John M. Pierce, Esq.